THOMAS EMERY, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 6106. Promulgated May 7, 1947.

*C. Walter Randall, Jr., Esq.,* for the petitioner.
*William H. Best, Jr., Esq.,* for the respondent.

### OPINION.

JOHNSON, *Judge*: The Commissioner determined a deficiency of
$983.88 in petitioner's income tax for 1941 by adjustments not in
controversy. In an amended petition petitioner asserts that he errone-
ously reported gains and losses from exchanges of bonds of the city
of Philadelphia for refunding bonds of like amount issued by the
city, and contends that the exchanges were nontaxable transactions
because the old and new certificates represented the same property or
because they were made in the course of a reorganization as defined
in section 112, Internal Revenue Code. Other assignments of error
were abandoned.

This proceeding was submitted upon a stipulation and exhibits,
herein incorporated by reference as findings of fact. From these it
appears that:

Petitioner, an individual residing at Oyster Bay, New York, filed
his income tax return for 1941 with the collector of internal revenue
for the second district of New York, at New York City. Prior to 1941
petitioner created a revocable trust, the income of which was con-
cededly taxable to him. Among assets of this trust were seven lots
of bonds issued by the city of Philadelphia, which bonds fell within
the terms of a refunding plan submitted to the city by Drexel & Co.
on April 10, 1941. By this plan, which was adopted and implemented

by ordinances of June 9 and 12, 1941, the city authorized the issuance of refunding bonds to be offered in exchange for designated issues of its outstanding bonds, bond for bond of equal principal amount. The refunding bonds, constituting a single consolidated issue, were to bear interest at the same rate as the outstanding bonds exchanged therefor until the first date on which the latter could be redeemed at the city's option and at a lesser rate thereafter. They were to bear coupons at issuance, but could be converted later into registered form if the holder desired. Drexel & Co. and Lehman Brothers were designated exclusive agents for the city in soliciting and making the exchanges, and for these services they were entitled to a commission of 1 per cent of the bond principal, payable by the applicant for exchange. The agents published and circulated a prospectus which invited exchanges and explained that outstanding bonds of $164,249,700 face value were eligible for exchange, while the face amount of refunding bonds authorized was limited to $131,064,000, and that applications for exchanges would be considered in the order of their receipt by Drexel & Co.

The Girard Trust Co., as trustee of the trust created by petitioner, elected to exchange the bonds held by the trust for the authorized refunding bonds, and the seven lots, described below with date of acquisition and cost to the trust, were exchanged for refunding bonds as follows:

| Bonds given in exchange | Bonds received in exchange |
|---|---|
| $12,000, 4% coupon, issued 12/30/19; due 7/26/72; callable 7/26/42; acquired 3/27/27; cost $13,080; surrendered 7/14/41. | $12,000, series B 1941, coupon 4% to 7/26/42; 2⅜% thereafter; due 1/1/49; callable 1/1/48; fair market value 7/14/41, $1,060.267 per M. |
| $9,000, 4¼% coupon, issued 10/5/23; due 12/1/73; callable 12/1/43; acquired 3/27/27; cost $10,158.75; surrendered 7/14/41. | $9,000, series C 1941, coupon 4¼% to 12/1/43; 3% thereafter; due 1/1/68; callable 1/1/49; fair market value 7/14/41, $1,109.718 per M. |
| $35,000, 4% coupon, issued 9/22/24; due 1/1/75; callable 1/1/45; acquired 1925; cost $35,218.75; surrendered 12/1/41. | $35,000, series E 1941, coupon 4% to 1/1/45; 3⅛% thereafter; due 1/1/70; callable 1/1/51; fair market value 12/1/41, $1,116.70 per M. |
| $11,000, 4¼% coupon, issued 12/30/19; due 2/1/74; callable 2/1/44; acquired 5/5/24; cost $11,082.50; surrendered 12/1/41. | $11,000, series D 1941, coupon 4¼% to 2/1/44; 3⅛% thereafter; due 1/1/73; callable 1/1/48; fair market value 12/1/41, $1,103.10 per M. |
| $3,000, 4¼% coupon, issued 10/5/23; due 9/16/75; callable 9/16/45; acquired 5/26/30; cost $3,033.75; surrendered 12/1/41. | $3,000, series G 1941, coupon 4¼% to 9/16/45; 3⅛% thereafter; due 1/1/68; callable 1/1/54; fair market value 12/1/41, $1,141.10 per M. |
| $3,000, 4½% coupon, issued 12/30/19; due 12/1/75; callable 12/1/45; acquired 5/26/30; cost $3,033.75; surrendered 12/1/41. | $3,000, series I 1941, coupon 4½% to 12/1/45; 3⅛% thereafter; due 1/1/68; callable 1/1/54; fair market value 12/1/41, $1,152.80 per M. |

$62,000, 4½% coupon, issued 10/5/23; due 4/1/76; callable 4/1/46; acquired 4/19/26; cost $62,387.50; surrendered 12/1/41.

$62,000, series K 1941, coupon 4¼% to 4/1/46; 3⅛% thereafter; due 1/1/66; callable 1/1/58; fair market value 12/1/41, $1,173 per M.

In surrendering the bonds the trustee sent a form letter of transmittal and paid the fee of $10 for each $1,000 bond exchanged. As agents for the city of Philadelphia, Drexel & Co. and Lehman Brothers were authorized to purchase outstanding bonds for cash, and made the following purchases:

| Date | Type | Price per M | Date | Type | Price per M |
|---|---|---|---|---|---|
| 7/2/41 | Issue of 12/30/19; 4% | $1,045.00 | 11/6/41 | Issue of 10/5/23; 4¼% | 1,135.00 |
| 7/9/41 | " " " | 1,045.00 | 11/12/41 | " " " | 1,137.50 |
| 7/11/41 | " " " | 1,045.00 | 11/13/41 | " " " | 1,135.00 |
| 7/1/41 | Issue of 10/5/23; 4¼% | 1,105.00 | 11/19/41 | Issue of 12/30/19; 4¼% | 1,151.25 |
| 7/3/41 | " " " | 1,098.75 | 11/28/41 | " " " | 1,148.75 |
| 7/9/41 | Issue of 9/22/24; 4% | 1,111.25 | 12/5/41 | " " " | 1,147.50 |
| 10/20/41 | " " " | 1,107.50 | 11/3/41 | Issue of 10/5/23; 4½% | 1,162.50 |
| 11/12/41 | Issue of 12/30/19; 4¼% | 1,092.50 | 11/28/41 | " " " | 1,162.50 |
| 11/24/41 | " " " | 1,092.50 | 12/1/41 | " " " | 1,162.50 |
| 11/25/41 | " " " | 1,092.50 | | | |

The refunding bonds were general obligations of the city of Philadelphia, which was empowered to levy ad valorem taxes without limitation as to rate for their payment. The only material respects in which these bonds differed from the outstanding bonds are set forth in the above description. The outstanding bonds for which they were issued in exchange were canceled.

In his income tax return for 1941 petitioner reported long term capital gains and losses resulting from the trustee's exchange of outstanding bonds for refunding bonds. In this computation he reflected the fee of $10 per $1,000 bond paid to Drexel & Co. for making the exchange and the fair market value of the refunding bonds, which was shown by a valuation schedule of Drexel & Co. He paid income tax of $28,669.61, reported as due by his return, and on March 2, 1945, filed a claim for refund, alleging error in reporting taxable gain on the exchange of the bonds.

Petitioner advances two arguments in support of his contention that no gain or loss should be recognized for tax purposes. The first is that the exchange falls within the ambit of *City Bank Farmers Trust Co.* v. *Hoey* (S. Dist. N. Y.), 52 Fed. Supp. 665; affirmed per curiam (C. C. A., 2d Cir.), 138 Fed. (2d) 1023; and *Motor Products Corporation*, 47 B. T. A. 983; affirmed per curiam (C. C. A., 6th Cir.), 142 Fed. (2d) 449. In both cases it was held that the taxpayer's exchange of bonds of the city of Detroit for refunding bonds of the same city resulted in no gain or loss recognizable for tax purposes because the bonds received were substantially identical with the bonds

surrendered, and hence the taxpayer, acquiring merely a new evidence of the same indebtedness, made no exchange of property at all. For these decisions to be controlling, it is not enough that petitioner received refunding bonds substantially similar or of like kind to those surrendered; the degree of resemblance must be so great that the two certificates represent the same property rights, particularly since section 112 (b) (1), in providing that an exchange of investment property for property of a like kind is tax-free, expressly excludes exchanges of bonds.

So recognizing, petitioner urges, none the less, that the differences between the Philadelphia bonds surrendered and received are as immaterial as the differences ignored in the cited cases. We are unable to find that this is so. As stated in *Motor Products Corporation, supra,* the only difference in the old and new Detroit bonds was the maturity date, but:

* * * such dates were of little or no significance to petitioner as a creditor of the city, for the city under the old defaulted bonds could have paid off any part or all thereof while they remained in default at any time funds were available and it likewise could have paid off any part or all of the new bonds, under its option * * *.

The terms of the old and new bonds of Philadelphia, on the contrary, present several material differences: The interest rate of the refunding bonds, fixed to equal the rate of the old bonds until the latters' first call date, was substantially less thereafter; the refunding bonds matured earlier than the old bonds—in the case of series B, 23 years earlier; the refunding bonds' call dates, however, were later, and the refunding bonds could be registered, while the old bonds of all types were in coupon form.

Of material bearing on the issue, furthermore, is the city's inferable purpose in adopting the refunding plan and the method chosen to carry it into effect. The outstanding bonds bore a higher rate of interest than the current money market demanded; it would have been to the city's advantage to call the old bonds at the earliest call date, and to issue new bonds at lower rates. In effect it accomplished this result in an anticipatory manner by paying the old rate on the new bonds until the old bonds' first call date and the lower rate thereafter. The refunding bonds, so viewed, are thus clothed with the character of a new obligation, having different terms and conditions. Significantly, the exchange offered was optional with the bondholder; a fee of 1 per cent was charged for making it; the amount of refunding bonds authorized was less than the amount of old bonds eligible for exchange, and hence after complete execution of the plan bonds of prior issues remained outstanding. They constituted property distinct and different from the refunding bonds, and that difference was reflected, proved, and emphasized by disparities in market value. For these reasons

we find that by the exchange the trustee acquired "a thing really different from what he theretofore had." *Weiss* v. *Stearn*, 265 U. S. 242, and hold that the resulting gains and losses are recognizable for tax purposes. *Girard Trust Co. (Moore Estate)* v. *United States* (E. Dist. Pa.), 69 Fed. Supp. 874; *Thomas Watson*, 8 T. C. 569; *Walter H. Field*, 41 B. T. A. 183.

As a second support for his contention, petitioner invokes section 112 (b) (3) of the Internal Revenue Code, providing that no gain or loss shall be recognized if stock or securities in a corporation are exchanged solely for stock or securities in such corporation pursuant to a plan of reorganization. By section 112 (g) the term "reorganization" is defined to include: "(E) a recapitalization * * *." And, since the city of Philadelphia is a municipal corporation, of which we take judicial notice, petitioner urges that by its refunding plan the city carried out a reorganization pursuant to which the trustee exchanged securities solely for securities in the same corporation, and hence no gain or loss is recognizable under section 112 (b) (3). He cites apt cases for the proposition that a reorganization may involve only an exchange of bonds for bonds, *United Gas Improvement Co.* v. *Commissioner* (C. C. A., 3d Cir.), 142 Fed. (2d) 216; *Commissioner* v. *Neustadt's Trust* (C. C. A., 2d Cir.), 131 Fed. (2d) 528, and argues that, since a municipal corporation is not expressly excluded by section 112, there is no reason to deny its bondholders the benefits of the section.

We are unable to agree. It seems manifest from the several provisions of section 112 that Congress referred to and only to the reorganization of a privately owned enterprise. The mergers, consolidations, stock, shareholders' control, and property transfers with which the section is concerned do not fit into the concept or activities of a municipal corporation, and only in exceptional transactions, such as an exchange of bonds for bonds, does the wording of the section so much as admit of meaning in respect of them. In holding taxable an exchange of assets for notes, the Supreme Court said in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462:

* * * to be within the exemption the seller must acquire *an interest in the affairs* of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes. * * * [Italics supplied.]

In the early leading case of *Cortland Specialty Co.* v. *Commissioner* (C. C. A., 2d Cir.), 60 Fed. (2d) 937, the court viewed the terms "reorganization," "merger," and "consolidation" as "indicating corporate readjustments of existing interests," and said of section 203, Revenue Act of 1926, predecessor of section 112:

* * * Its purpose was to relieve those interested in corporations from profits taxes in cases where there was only a change in the corporate form in

which business was conducted without an actual realization of any gain from an exchange of properties. * * *

The section has as a "primary requisite that there must be some continuity of interest on the part of the transferor * * *." And to justify its application, securities given in exchange must create: "such obligations as to give creditors or others some assured participation in the properties of the transferee corporation. * * *."

In *United Gas Improvement Co.* v. *Commissioner*, 142 Fed. (2d) 216, the Circuit Court of Appeals for the Third Circuit gave as the underlying test for the section's application a "Continuity of ownership of a business enterprise following its reorganization * * *."

The Supreme Court, adopting these views, has been no less specific, saying in *Le Tulle* v. *Schofield*, 308 U. S. 415:

* * * Where the consideration is wholly in the transferee's bonds, or part cash and part such bonds, we think it cannot be said that the transferor retains any proprietary interest in the enterprise. * * *

And the court then held the section inapplicable because the taxpayer was not "one having a proprietary stake" in the issuing corporation. See also *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179. As an individual can not acquire "a proprietary stake" in a municipal corporation, it follows that petitioner's exchange of bonds for bonds of the city of Philadelphia does not meet the underlying test.

The relation of section 112 to municipal corporations was considered in *Speedway Water Co.* v. *United States*, 100 Fed. (2d) 636, by the Circuit Court of Appeals for the Seventh Circuit, and from its opinion we quote the following remarks, with which we are fully in accord:

We find nothing in the statute to indicate that Congress intended that a municipal corporation should be included within "parties to a reorganization." Indeed, it seems apparent that the purpose of the exemption provisions included in the legislation was to remove an impediment to corporate readjustments and to prevent the taxation of purely fictitious gains. *Mead Coal Co.* v. *Commissioner*, 4 Cir., 72 F. 2d 22. A municipal corporation is not engaged in business in the ordinary sense of the term and, though its activity in conducting a water plant may be denominated as exercise of a proprietary function rather than one governmental in character, such an activity is one permitted by the state legislature for the promotion and protection of the welfare of the citizens of the community, and partakes of none of the significant elements of an industrial, financial or other private business activity. Mergers, consolidations, reorganizations are, in the ordinary significance of those terms, confined to private corporations and the debates of Congress and the words of the statute disclose not the slightest evidence of intent that a sale of a water plant to a municipal corporation should be included in the exemption from taxes provided in case of reorganization of corporations.

Petitioner's exchanges of bonds for bonds constituted taxable transactions, on which gains and losses were properly reported and reflected in the computation of his income tax.

Reviewed by the Court.

*Decision will be entered for the respondent.*

VAN FOSSAN, and HARRON, *JJ.*, concur only in the result.

---

LEMIRE, *J.*, dissenting: I must disagree with the majority's rulings on both of the questions presented in this case.

On the first question, it seems to me that there was no taxable transaction when the taxpayer exchanged his old city of Philadelphia bonds for new bonds of the same municipality which were issued for the sole purpose of refinancing the bonded indebtedness. While there were slight differences in the terms and conditions of the old and new bonds, they were, I think, substantially identical properties. They both evidenced the same investment and the same debt. In that respect I do not think that this case is distinguishable from *Motor Products Corporation*, 47 B. T. A. 983; affirmed per curiam, 142 Fed. (2d) 449 (C. C. A., 6th Cir.), and *City Bank Farmers Trust Co.* v. *Hoey*, 52 Fed. Supp. 665.

On the second question, I am not in agreement with the majority opinion that municipal corporations are inferentially excluded from the reorganization provisions of the statute as found in section 112 of the Internal Revenue Code.

If the refinancing of its bonded indebtedness by the city of Philadelphia constituted a reorganization within the meaning of section 112 (g) of the code, it follows that this exchange of bonds pursuant thereto was a nontaxable exchange within the meaning of section 112 (b) (3). One type of reorganization, as that term is defined in section 112 (g), is "(E) a recapitalization." It has been held in two recent cases, *Commissioner* v. *Neustadt's Trust*, 131 Fed. (2d) 528 (C. C. A., 2d Cir.), affirming 43 B. T. A. 848; and *United Gas Improvement Co.* v. *Commissioner*, 142 Fed. (2d) 216 (C. C. A., 3d Cir.), affirming 47 B. T. A. 715, that the refinancing of a bonded indebtedness by a private corporation constitutes a recapitalization, and therefore a reorganization, within the meaning of the statute.

In both of those cases it was held that the exchange of old securities for new securities pursuant to a plan of reorganization was a nontaxable exchange. In the *Neustadt's Trust* case the court said:

* * * On the other hand the purpose of the statutory nonrecognition of gain or loss from reorganization transactions, favors ascribing to the word "recapitalization" a broad rather than a restricted meaning. Such purpose, as indicated

by the Congressional reports printed in the margin, was apparently twofold: To encourage legitimate reorganizations required to strengthen the financial condition of a corporation, and to prevent losses being established by bondholders, as well as stockholders, who have received the new securities without substantially changing their original investment. The transaction in the case at bar meets both of these tests. By changing the interest rate and date of maturity of its old bonds and adding a conversion option to the holders of the new, the corporation could strengthen its financial condition, while the bondholders would not substantially change their original investments by making the exchange. "Recapitalization" seems a most appropriate word to describe that type of reorganization and it is the very kind of transaction where Congress meant the recognition of gain or loss to be held in suspense until a more substantial change in the taxpayer's original investment should occur. * * *

That language of the court seems particularly appropriate in the situation that we have here. The only possible way, it seems to me, of escaping the force of those decisions is to say, as does the majority opinion, that the reorganization provisions of the statute do not apply to municipal corporations.

It is said to be "manifest" that Congress intended the provisions of section 112 to apply only to privately owned enterprises. There is nothing in the wording or in the history of the statute which convinces me that Congress had any such intent. As it is written, the statute embraces all corporations, whether private, public, or quasi-public. There are no committee reports or other evidence showing that in enacting section 112 Congress used the words corporation, reorganization, or recapitalization with any restrictions that would exclude municipal corporations.

The benefits of the National Bankruptcy Act, as amended in 1938 and again in 1946, are expressly extended to municipal corporations. See ch. 9, sec. 401, Title 11, United States Code Annotated. The constitutionality of the act was upheld by the Supreme Court in *United States v. Bekins*, 304 U. S. 27. Bankruptcy reorganizations of insolvent municipal corporations are not uncommon.

From the standpoint of the bondholder there is little difference between an exchange of bonds under a plan of recapitalization involving a municipal corporation and an exchange of bonds under a plan of recapitalizing a business corporation.

*Speedway Water Co.* v. *United States*, 100 Fed. (2d) 636, relied upon in the majority opinion, does not seem to me to be controlling here. That case involved the sale of a waterworks system by a private owner to the town of Speedway, Oklahoma, in exchange solely for bonds of the municipality. The court determined, and properly so, that there was no statutory reorganization within the meaning of section 112, but that the transfer was an out and out sale. The further observation of the court that Congress did not

intend for municipal corporations to be covered by the reorganization provisions of the statute was *obiter dictum.*

I think that our decision should have been for the petitioner.

I respectfully dissent.

---

OPPER, *J.*, dissenting: I concur in the foregoing dissent in so far as it deals with the application of section 112 to municipal corporations. And if this proceeding had been decided accordingly, there would then have been no necessity for considering the first question.