FEDERAL NATIONAL MORTGAGE ASSOCIATION,
PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 21556-86.        Filed March 14, 1988.

*Felix B. Laughlin, Joseph Angland,* and *Michael Schlesinger,* for the petitioner.[1]

*Kendall C. Jones* and *Lawrence M. Hill,* for the respondent.

KÖRNER, *Judge:* Respondent determined deficiencies in petitioner's Federal corporate income tax as follows:

| Year | Deficiency |
|---|---|
| 1971 | $147,902 |
| 1973 | 9,558,360 |
| 1977 | 3,764,520 |
| 1979 | 10,948,154 |

In addition to contesting these determinations, petitioner has requested that this Court find overpayments as follows:

| Year | Overpayment |
|---|---|
| 1977 | $93,185,818 |
| 1979 | 46,631,003 |

After concessions, the issues for decision are: (1) Whether petitioner realized recognizable losses in 1980 and 1981 when it exchanged interests in pools of mortgage loans, and (2) whether petitioner realized recognizable gains or losses in

---

[1]Brief amicus curiae was filed by Richard L. Bacon as attorney for the United States League of Savings Institutions.

1981 and 1982 when it received payment on old mortgage loans and purchased new mortgage loans in connection with its resale/refinance program.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

### *Background*

Federal National Mortgage Association (petitioner), is a corporation whose principal place of business was in Washington, D.C., when it filed its petition herein. Petitioner filed its Federal corporate income tax returns for the years at issue on a calendar year basis and used an accrual method of accounting.

Petitioner was originally established in 1938 as an agency of the Federal Government. In 1968, it was transformed into a for-profit, privately owned, corporation. Although it is now privately owned, it retains close ties with the Federal Government. During 1980, 1981, and 1982, the President of the United States appointed one-third of petitioner's directors. Additionally, petitioner remains subject to regulation by the Secretary of the Department of Housing and Urban Development (HUD).

Petitioner has a congressional mandate to "provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing." Housing Act of 1954, ch. 649, tit. II, sec. 201, 68 Stat. 612, 12 U.S.C. sec. 1716(a) (1982). Petitioner provides liquidity for mortgage investments primarily by purchasing mortgages from lenders, using funds it acquires by issuing stock and debt securities. Its mortgage purchases have made petitioner the largest investor in home mortgages in the United

---

[2]Claimed losses from 1980, 1981, and 1982 were carried back to the years at issue. Respondent's disallowance of the losses at issue contributed to the deficiencies determined. Although we have no jurisdiction over petitioner's tax liabilities for the years 1980, 1981, and 1982 in this case, we may consider events occurring in those years as they may affect tax liability of petitioner in the years before us. Sec. 6214(b), I.R.C. 1954.

States.[3] Petitioner's net mortgage portfolio balance at December 31 for the years 1979 through 1982 was as follows:

| Year | Balance |
|------|---------|
| 1979 | $49.7 billion |
| 1980 | 55.7 billion |
| 1981 | 59.8 billion |
| 1982 | 69.7 billion |

From 1980 through 1982, petitioner's assets consisted largely of long-term, fixed-rate mortgage loans. Interest rates had increased since the mortgage loans were issued and the value of the mortgages had therefore declined significantly.[4] Petitioner's debt during those years was relatively short-term compared to its assets. As interest rates rose, the interest petitioner paid on its debt increased more rapidly than the interest it received on its assets. By 1979, petitioner was paying a higher interest rate on its new borrowings than the average rate it received from its mortgages.[5] By 1981, petitioner was paying more interest on the debt it used to carry its mortgages than it was earning from the mortgages and was losing money.[6] The situation threatened petitioner's economic viability. In an effort to remedy the financial difficulties in which it found itself, petitioner entered into two types of transactions that produced the claimed losses now in issue: Concurrent Mortgage Sales and the Resale Refinance Program.

## I. *Concurrent Mortgage Sales*

In 1980 and 1981, petitioner engaged in 71 transactions, referred to as Concurrent Mortgage Sales (CMS) transactions, with 50 unrelated financial institutions, including 40 savings and loan associations, five commercial banks, two savings banks, and three mortgage bankers. In each CMS

[3]In some parts of the United States, home financing is typically done through mortgages; in other areas, deeds of trust are used. In the context of the present case, it is a distinction without a difference. For convenience, the promissory notes in which petitioner invested, secured by liens on real property, will be referred to as mortgages.

[4]On Dec. 31, 1980, the total fair market value of the mortgages held by petitioner was only 69.75 percent of their face value.

[5]Petitioner paid an average interest rate of 10.72 percent on amounts it borrowed during 1979. The average yield from its mortgages was only 8.75 percent on Dec. 31 of that year.

[6]In 1981, petitioner's interest expense on debt incurred to carry mortgages exceeded its interest income from its mortgage loans by $260 million.

transaction, the parties exchanged 90-percent undivided participation interests in two groups of home mortgage loans.[7] Petitioner claimed the following tax losses from the CMS transactions:

| Year | Loss |
|---|---|
| 1980 | $194,573,659 |
| 1981 | 70,042,179 |

Petitioner began considering CMS transactions in early 1980, when its tax counsel advised Robert J. Mahn, petitioner's controller, that petitioner could recognize the losses that it had suffered due to the decrease in value of its mortgage loan portfolio by engaging in the transactions. Mahn thereafter gave considerable thought to whether CMS transactions would be desirable for petitioner.

When Mahn analyzed the desirability of CMS transactions, the first benefit that he considered was the tax benefit. Mahn realized that the loss carryback and carryforward provisions of the Code might enable petitioner to recover Federal income taxes it had paid in earlier years and avoid paying some taxes in future years. As Mahn analyzed the proposed CMS transactions, it became apparent to him that they would also yield petitioner several significant non-tax benefits, which are discussed more fully *infra.*

After he thoroughly evaluated the proposed CMS program, Mahn recommended that petitioner sponsor the program and engage in the transactions. Petitioner's board of directors approved the proposed program in June 1980.

A. *Selection Criteria*

Although petitioner was not subject to regulation by the Federal Home Loan Bank Board (FHLBB), most of the financial institutions with which it engaged in CMS transactions, were. The savings and loan associations that participated in the CMS transactions were required to file semi-annual financial reports with the FHLBB reporting their

---

[7]The transactions were sales in form as the parties exchanged payments for the participation interests they obtained. It is customary in the secondary market for parties to sell participation interests in mortgage loans. That technique reduces the administrative expenses that would result from the transfer of the ownership of the entire loan. For convenience, rather than stating that the parties to the CMS transactions exchanged "participation interests in home mortgage loans," the remainder of this discussion will state that the parties exchanged "mortgages."

financial condition in conformity with accounting principles adopted by the FHLBB; those principles are commonly referred to as regulatory accounting principles (RAP). FHLBB rules provided that federally insured savings and loan associations whose net worth, as measured according to RAP, fell below certain standards could be closed by the FHLBB.

In 1980 and 1981, savings and loan associations generally were in very weak financial condition. An unprecedented surge in interest rates had left savings and loan associations with stagnant interest revenues from their low-interest mortgage loans and escalating interest costs for attracting depositors' funds to support the mortgage loans. As a result of this squeeze on interest margins, the savings and loan industry's net income plummeted from an historical high of $3,918 million in 1978 to a loss of $4,632 million in 1981. The annual rates of return on assets of insured savings and loan associations for the years 1978 through 1981, which illustrate the drastic downturn in 1980 and 1981, are set forth below:

*Return on assets of insured savings associations*

| | |
|---|---|
| 1978 | 0.84% |
| 1979 | 0.68 |
| 1980 | 0.13 |
| 1981 | −0.93 |

The savings and loan industry was widely perceived to be in imminent danger of collapse.

Savings and loan associations and other financial institutions had an economic incentive to recognize for tax purposes the losses that they had suffered due to the decrease in value of their mortgage loan portfolios. There would have been risk in doing so, however, had they been compelled to recognize the losses for purposes of reporting to the FHLBB, thereby decreasing their net worth and risking closure by the FHLBB.

On June 27, 1980, the FHLBB issued Memorandum R-49 in which it set forth 10 criteria that the mortgages exchanged were required to meet in order for no loss to be recognized from the CMS transactions under RAP. Specifically, the mortgages all had to:

1. involve single-family residential mortgages,
2. be of similar type (e.g., conventionals for conventionals),[8]
3. have the same stated term to maturity (e.g., 30 years),
4. have identical stated interest rates,
5. have similar seasoning (i.e., remaining terms to maturity),
6. have aggregate principal amounts within the lesser of 2½ percent or $100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash,
7. be sold without recourse,
8. have similar fair market values,
9. have similar loan-to-value ratios at the time of the reciprocal sale, and
10. have all security properties for both sides of the transaction in the same state.

In order to ensure that the mortgages it received in these transactions satisfied minimum quality standards, petitioner imposed four additional criteria that mortgages were required to meet to be involved in CMS transactions:

1. All loans must have been in a current or prepaid status.
2. Any loan that had been 30-days delinquent more than once in the prior 12 months was excluded from consideration.
3. All loans must have been originated at least 12 months prior to the transaction.
4. In the case of FHA loans, graduated payment mortgages were excluded.

In addition, any loan whose current unpaid principal balance exceeded petitioner's loan ceiling was excluded from eligibility.

The mortgages underlying the 90-percent participation interests that were exchanged in each CMS transaction were chosen so as to comply with the above criteria.[9]

## B. *Implementing the CMS Transactions*

Any financial institution that wished to participate in the CMS program submitted to petitioner a computer tape

---

[8]In this context, a "conventional" mortgage is a mortgage that is neither insured by the FHA nor guaranteed by the VA. FHA-insured loans are insured by the Federal Housing Administration against loss in the event of a default by the borrower. VA-guaranteed loans are guaranteed by the Veterans Administration against loss due to default.

[9]For example, conventional 30-year mortgage loans, secured by properties in Virginia, that paid 8-percent interest, had a remaining life of between 17 and 18 years, and had a loan-to-original-value ratio of between 80.01 and 90 percent would be exchanged only for loans that satisfied those same criteria.

containing information about the mortgages that it was making available for possible inclusion in the exchange.

In each transaction, petitioner's computer sorted the mortgages on the tape into categories defined by the criteria in Memorandum R-49. That is, all the mortgages in a particular category would have the same interest rate, have underlying properties in the same State, be of the same type (i.e., conventional, FHA or VA), and have similar remaining terms and (for conventional mortgages) original loan-to-value ratios. Petitioner's computer then sorted the mortgages from petitioner's portfolio into the same categories. Within each category, the computer then selected a pool of mortgages from each portfolio for inclusion in the transactions. As Memorandum R-49 required that the aggregate principal balances of each pool of petitioner's mortgages and each corresponding pool of the other institution's mortgages be within the lesser of $100,000 or 2.5 percent of one another, not every mortgage in every category was included in the pools that were exchanged. For each category, the computer dropped mortgages from one or both sides until the principal balances of the remaining mortgages became approximately equal. When selecting mortgages for petitioner to receive, petitioner's computer gave preference to loans whose underlying properties had urban postal zip codes; when selecting mortgages to exchange, petitioner's computer gave preference to loans whose underlying properties did not have urban zip codes.

## C. *Determination of Petitioner's Tax Loss*

Each package of mortgages included in a CMS transaction was valued at a price reflecting its fair market value, and each party transferred funds to the other, representing the fair market value of the mortgages acquired. The two transfers were as close as possible, but not precisely identical in amount. Petitioner computed its tax loss on each transaction by calculating the difference between 90 percent of its total tax basis in the underlying mortgages and the value of the package it received.[10]

---

[10]Petitioner's tax basis in each mortgage was its cost basis in the loan, plus the amortized discount and less the amortized principal relating to the mortgage, all as of the sale date.

Although petitioner required the mortgages it received to meet certain minimum standards, it did not take any steps to ensure that such mortgages were likely to have the same payment characteristics, delinquency rates, and foreclosure rates as the mortgages it exchanged.[11] In fact, petitioner recognized that there were a number of significant differences between the mortgages that made it unlikely that they would behave the same economically. Specifically, in each CMS transaction: (1) The mortgages that petitioner received had different obligors than the mortgages it exchanged; (2) the real properties securing the mortgages that petitioner received were different from the real properties securing the mortgages that petitioner exchanged; and (3) the geographic distribution of the real properties securing the mortgages varied. Petitioner accepted the risk that the mortgages would behave differently economically in order to receive the benefits that it derived from the transactions.

Since the CMS transactions took place, the mortgages that petitioner received in fact have performed differently than the mortgages that petitioner exchanged. In each CMS transaction, the mortgage pool that petitioner received exhibited different delinquency ratios from the mortgage pool that petitioner exchanged. For most CMS transactions, there were differences in the number and timing of foreclosures between the mortgages that petitioner received and exchanged. For most CMS transactions, there were differences in the number of mortgages that were prepaid in full between the mortgages that petitioner received and exchanged. The overall percentages of the mortgages received and exchanged by petitioner that were paid off and foreclosed through March 31, 1987, are as follows:

| 1980 Transactions | Percent foreclosed | Percent paid off |
|---|---|---|
| Mortgages received | 0.65% | 33.7% |
| Mortgages exchanged | 0.49 | 29.7 |
| 1981 Transactions | | |
| Mortgages received | 0.27 | 21.8 |
| Mortgages exchanged | 0.72 | 23.9 |

---

[11]Petitioner did not underwrite any of the mortgages that it sold or exchanged in the CMS traansactions.

The following percentages of the mortgages received and exchanged by petitioner were delinquent as of the months indicated:

1980 TRANSACTIONS

| Month | Mortgages received | Mortgages exchanged |
|-------|--------------------|--------------------|
| Dec. 1982 | 3.40% | 2.67% |
| Dec. 1983 | 3.84 | 3.04 |
| Dec. 1984 | 4.40 | 2.88 |
| Mar. 1985 | 4.10 | 2.86 |
| June 1985 | 4.13 | 2.52 |
| Sept. 1985 | 3.92 | 2.70 |
| Dec. 1985 | 4.06 | 2.89 |
| Mar. 1986 | 4.73 | 2.82 |
| June 1986 | 4.33 | 2.77 |
| Sept. 1986 | 4.13 | 3.38 |
| Dec. 1986 | 4.86 | 4.31 |
| Mar. 1987 | 4.08 | 2.82 |

1981 TRANSACTIONS

| Month | Mortgages received | Mortgages exchanged |
|-------|--------------------|--------------------|
| Dec. 1982 | 4.96% | 2.14% |
| Dec. 1983 | 3.91 | 2.67 |
| Dec. 1984 | 3.88 | 2.82 |
| Mar. 1985 | 5.07 | 2.69 |
| June 1985 | 4.59 | 2.49 |
| Sept. 1985 | 3.86 | 2.65 |
| Dec. 1985 | 4.88 | 3.16 |
| Mar. 1986 | 4.21 | 3.23 |
| June 1986 | 5.11 | 2.55 |
| Sept. 1986 | 3.61 | 3.34 |
| Dec. 1986 | 4.54 | 2.70 |
| Mar. 1987 | 3.42 | 3.98 |

D. *Petitioner's Motives for the Transactions*

Petitioner conducted CMS transactions for a number of reasons in addition to recognizing losses for tax purposes. Those reasons included: increasing its holdings of urban loans; expanding its customer base by developing relationships with savings and loan associations; increasing the portion of its portfolio with enforceable due-on-sale clauses; and bolstering the secondary mortgage market by helping

ailing savings and loan associations to diversify their portfolios and to recognize losses for tax purposes.

1. *Increase in Urban Loan Holdings.*—Petitioner engaged in the CMS transactions, in part, to increase its holdings of urban loans. In the late 1970's, petitioner came under substantial pressure from the Secretary of HUD, its principal regulator, to increase its holdings of urban mortgage loans. The Secretary of HUD was so dissatisfied with petitioner's efforts that she attempted to have the chairman of petitioner's board removed. HUD also promulgated regulations to mandate that 30 percent of petitioner's annual mortgage purchases be urban mortgages.[12] On June 17, 1980, in its resolution approving the CMS program, petitioner's board of directors listed serving the needs of the urban and low/moderate income sectors of the mortgage market as one of the purposes of the CMS transactions.

The system petitioner developed for selecting mortgages for the CMS transactions gave priority to urban mortgages in the packages to be received by petitioner and to nonurban mortgages in the packages to be exchanged by petitioner. As each CMS transaction was consummated, petitioner recorded the number of urban mortgages received and exchanged, along with the associated unpaid principal balance. As a result of the CMS transactions, petitioner acquired urban mortgages with an unpaid principal balance of about $318 million, while giving up urban mortgages with an unpaid principal balance of about $121 million. Petitioner thus increased its interests in urban mortgages by approximately $197 million.

2. *Expansion of Customer Base.*—Petitioner engaged in the CMS transactions, in part, to broaden its customer base by establishing relationships with savings and loan associations. As of 1980, petitioner did the vast majority of its business with mortgage bankers and very little with savings and loan associations. Petitioner wanted to increase its business with savings and loan associations. Petitioner hoped to use the CMS transactions to establish initial

---

[12]In 1978, HUD promulgated final regulations that require at least 30 percent of the mortgages petitioner purchases each calendar year to be secured by urban properties in order to prevent HUD from establishing a mandatory annual goal for urban purchases. See 24 C.F.R. sec. 81.16(d)(1) (1987); 43 Fed. Reg. 36,200 (Aug. 15, 1978).

contacts with particular savings and loan associations that would lead to additional business with them. Petitioner was only modestly successful in achieving this goal. Of the 48 still-existing institutions that participated with petitioner in a CMS transaction during 1980 and 1981, 37 had never dealt with petitioner before. Subsequent to the transactions, 14 of these new customers continued doing business with petitioner in transactions outside the CMS program.

3. *Due-on-Sale Enforcement.*—Before November 10, 1980, petitioner had a policy of not enforcing due-on-sale clauses in most mortgages it held.[13] Petitioner had directed the lenders that serviced the loans it owned to advise the borrowers of the policy.

Petitioner's nonenforcement policy meant that a borrower who was paying a below-market interest rate could sell his home and allow the buyer to assume the existing mortgage at the below-market interest rate. As a result of its nonenforcement policy, petitioner was frequently left holding low-yielding mortgages at times when its cost of borrowing funds had increased. Consequently, decreasing its holdings of assumable mortgages was one of petitioner's objectives as of 1980. Petitioner had not yet changed its policy regarding due-on-sale clause enforcement when the CMS program was approved in June 1980, but it was already seriously considering changing its policy.

In August 1980, petitioner announced a prospective change in its policy, and it began enforcing due-on-sale clauses in all conventional mortgages purchased pursuant to commitments issued on or after November 10, 1980. For the mortgages already in its portfolio, petitioner honored its promise of not enforcing the due-on-sale clauses. Petitioner adopted this policy change in order to improve the yield on its mortgage portfolio.

The CMS transactions gave petitioner the opportunity to replace mortgages with due-on-sale clauses that it had promised not to enforce with mortgages containing due-on-sale clauses that it was free to enforce under its new policy.

---

[13]"Due-on-sale" clauses permit the holder of a mortgage to require full repayment of such loan if the mortgagor sells the underlying property. As of 1980, the due-on-sale clause was a common feature in conventional mortgage instruments. Prior to 1972, conventional mortgages frequently contained no "due-on-sale" clauses, and were freely assumable, or properties were taken "subject to" existing mortgages by the purchaser.

It offered petitioner some measure of future protection against the predicament in which petitioner then found itself—holding long-term lower fixed-rate mortgages in a rapidly rising interest market.

4. *Bolstering the Secondary Market.*—One of the reasons that petitioner entered into the CMS transactions was to bolster the savings and loan industry. As a result of its congressional mandate to provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, petitioner felt a general obligation to enhance the financial viability of the savings and loan industry. Petitioner viewed the CMS transactions as being potentially beneficial to savings and loans for two reasons: First, the program gave savings and loan associations with mortgage loan portfolios that were geographically concentrated within a State the opportunity to diversify the geographic distribution of their portfolios and thus make themselves less vulnerable to localized economic downturns. Second, the program gave savings and loans the opportunity to obtain Federal income tax refunds by recognizing the losses that they had suffered due to the decline in the value of their mortgage portfolios.

## E. *Conclusion of the CMS Program*

Petitioner completed its last CMS transaction in June 1981. The transactions ended then because savings and loans stopped approaching petitioner about engaging in CMS transactions.

Petitioner reported losses from its 1980 CMS transactions on its original Federal corporate income tax return for 1980. Respondent disallowed the deduction of the loss. Petitioner paid the resulting deficiency and subsequently filed an amended return for 1980 to reclaim the deduction. Petitioner did not report losses from its 1981 CMS transactions on its original return for 1981. It instead claimed the loss on an amended return for 1981. Respondent disallowed the deduction of the losses claimed on the amended returns.

Petitioner did not report losses from the CMS transactions for financial accounting purposes.

## II. *Resale/Refinance Transactions*

As another means of alleviating the financial problem which petitioner faced in 1980 and 1981—holding a large portfolio of fixed rate, low interest, long-term loans at a time of rapidly escalating market interest rates—petitioner instituted the resale/refinance program (the program) in March 1981.[14] The program was designed by petitioner to accomplish a number of business objectives. Specifically, the program was designed to: (1) Enable petitioner to replace below-market-rate mortgages held in its portfolio (original mortgages) with new higher-rate, but still below-market, mortgages secured by the same property; (2) reduce the number of mortgages in petitioner's portfolio that had due-on-sale clauses that petitioner had agreed not to enforce; (3) reduce the number of mortgage loans in petitioner's portfolio that, by their terms, were freely assumable; and (4) discourage the practice of "wrapping around" the original mortgages.[15]

The principal amount of each new mortgage was greater than the unpaid principal balance of the original mortgage by the amount of the additional cash loaned. The term-to-maturity of each new mortgage was 30 years and always exceeded the remaining term-to-maturity of the original mortgage. Each new mortgage was assumable by a subsequent purchaser only within 1 year of when it was made, except if the property was located in a State that restricted due-on-sale enforcement. In contrast, each original mortgage was assumable anytime. Each new mortgage was a conventional mortgage, whereas the original mortgages could be FHA, VA, or conventional. For resale/refinance transactions in 1981 and 1982, 55 and 51 percent, respectively, involved original loans that were either FHA or VA. In resale transactions, the borrower on each new mortgage was

[14]In a "resale" transaction, the new mortgage acquired by petitioner was originated to finance the resale of the property that had secured the old mortgage; in a "refinance" transaction, the new mortgage acquired by petitioner was originated to refinance the old mortgage and to extend additional cash to the borrower.

[15]A wraparound mortgage loan is a special type of second mortgage loan. When a mortgage is "wrapped around," the new lender makes a second mortgage loan to a borrower with an existing first mortgage. The new lender then collects from the borrower the total due on the first and second mortgages, and pays the original lender the amount due on the first mortgage. The original lender is frequently either unaware that the first mortgage has been "wrapped," or has no right to prevent it.

different than the obligor on the original mortgage. The stated interest rates of all of the original mortgages were fixed rates. The stated interest rates on the new mortgages were allowed to be either fixed rate or adjustable rate.

Petitioner did not originate the new mortgages that it purchased under the program. Petitioner instead directed the program to the lenders who serviced the old mortgages in its portfolio. Lenders were willing to participate in the program because it benefited them financially. The program offered them the opportunity to receive fees for making the new loans, and to increase their servicing fee income.[16] Additionally, the lenders shared in any interest that they could charge the borrowers on the new loans in excess of the required minimum yield set by petitioner. The lenders made the new mortgage loans and then sold them to petitioner, pursuant to petitioner's commitment to purchase such new loans which met its specifications. The new mortgages were obligations of third-party borrowers, and not of the lenders.

A lender would typically initiate a resale/refinance transaction by reviewing the portfolio of loans it was servicing for others to identify which mortgage loans were owned by petitioner. It would then contact the borrowers and attempt to convince them to acquire new loans. The incentive offered potential borrowers to refinance their original loans was that the program enabled them to borrow a larger sum of money at a below-market rate.

When a lender located a borrower who was interested in participating in a resale/refinance transaction, the lender would obtain from petitioner a quotation of the interest rate that petitioner would require on the new mortgage loan. The *required* interest rate was a function of the prevailing market interest rate, the interest rate on the old loan, the amount of the additional cash to be loaned, and the remaining balance and remaining term of the old loan. The interest rates *actually charged* on the new mortgages were not direct functions of those factors, however, as lenders had an incentive to charge higher rates. Petitioner's pricing

---

[16]Servicing fees increased as the amount of the mortgage increased. Petitioner permitted lenders to charge loan origination fees of up to three points, out of pocket expenses, FNMA commitment fee, FNMA prior approval fee, and any loan discount charges that the seller must pay to FNMA because the loan yield was less that required by the commitment.

formula was designed to arrive at a required interest rate on each new mortgage that was less than the prevailing market interest rate but higher than the interest rate on the old mortgage.[17]

If a borrower advised a lender that he wished to proceed with a resale/refinance transaction, the lender would obtain a 90-day commitment from petitioner to buy the new mortgage at its face amount. Petitioner's obligation to purchase the new mortgage was contingent on the payment in full of the remaining principal amount of the original mortgage.

At the settlement of a new mortgage loan, the borrower would execute the new mortgage, and the lender originating the new mortgage would transfer cash equal to the full principal amount of the new mortgage as follows: Cash equal to the unpaid principal balance of the original mortgage was paid by the lender to petitioner, and the remainder of the cash was paid to the borrower.

After each settlement, the lender obtained the original mortgage note from petitioner and recorded the release of that lien with the local recorder of deeds. The lender then submitted the new mortgage to petitioner. After petitioner confirmed that the original mortgage had been paid in full and that the terms of settlement were consistent with its commitment, it issued a check to the lender in the face amount of the new loan.

In 1981 and 1982, the program resulted in petitioner's purchasing 35,885 new mortgage loans with a total face amount of $2.116 billion, and the payment in full of original mortgage loans with a total unpaid principal balance of $1.196 billion. Of the new mortgages purchased by petitioner, 22,269 mortgages with a total face amount of $1.301 billion were purchased in resale transactions, and 13,616 mortgages with a total face amount of $815 million were purchased in refinance transactions.

---

[17]In 1981, the average interest rate on resale/refinance new loans was about 13.08 percent, the average interest rate on the old loans being replaced was about 9.15 percent, and the average market interest rate on newly issued 30-year fixed-rate conventional loans was about 16.39 percent. In 1982, the average interest rate on resale/refinance new loans was about 13.09 percent, the average interest rate on the old loans being replaced was about 9.28 percent, and the average market interest rate on newly issued 30-year fixed-rate conventional loans was about 15.30 percent.

A number of the original mortgages that were paid in full as a result of the program were carried on petitioner's books at a discount from face value. For *tax* accounting purposes, petitioner normally amortizes discount arising from the purchase of a mortgage into income over the term of the loan. If a mortgage is prepaid in full, petitioner normally recognizes any unamortized discount as income in the year the loan is prepaid. Petitioner did not recognize the unamortized discount remaining on the original mortgages involved in the program as income on its original Federal corporate income tax returns for 1981 and 1982. For tax accounting purposes, petitioner instead assigned the entire original discount from the old mortgages, including the portion of the discount that had been amortized previously into income, to the new mortgages and deducted any discount that had been amortized into income previously.[18] Petitioner did not, however, report any tax consequences as the result of the 1981 and 1982 resale/refinance transactions on its original Federal corporate income tax returns for 1981 and 1982, except the deduction it claimed for the portion of the original discount from the old mortgages that had been amortized into income previously.

For *financial* accounting purposes, petitioner amortizes purchase discount into income over a 20-year period, regardless of prepayments or foreclosures. Petitioner accordingly reported neither gain nor loss from the resale/refinance transactions for financial accounting purposes.

On its amended Federal income tax returns for 1981 and 1982, filed on March 27, 1984, petitioner treated the payment in full of the old mortgages and its purchase of the new mortgages as taxable exchanges of the old mortgages plus cash for the new mortgages, resulting in the recognition of gain or loss on the disposition of the old mortgages.[19] Petitioner accordingly reported on its amended

---

[18]For example, if the original discount arising at the time the original mortgage was acquired, by petitioner equaled $10,000 and petitioner had subsequently amortized $300 into income prior to refinancing the original mortgage, then in the year in which the new mortgage was acquired, petitioner would claim a deduction of $300 and assign $10,000 of discount to the new mortgage.

[19]On its amended Federal income tax returns for 1981 and 1982, petitioner measured its gain or loss with respect to each new mortgage as the difference between (i) the fair market value (as determined by petitioner at the time of receipt) of such new loan and (ii) the sum of petitioner's basis in the original mortgage secured by the same property plus the net cash payment made by petitioner.

returns for 1981 and 1982 that it realized the following net losses from resale/refinance transactions engaged in during those years:

| Year | Loss |
|------|------|
| 1981 | [20]$211,337,943 |
| 1982 | [21]124,083,886 |

In his notice of deficiency, respondent disallowed the deduction of the net losses claimed on petitioner's amended returns from the 1981 and 1982 resale/refinance transactions, and determined that petitioner "had recognized gains from the resale/refinance program in the amounts of $13,816,154 and $14,521,949 which were not reported in the taxable years 1981 and 1982, respectively." Those amounts were equal to the total original discount on the old mortgages that were paid off in such years and refinanced with new mortgages.

## OPINION

### I. *CMS Transactions*

The first issue for decision is whether petitioner realized recognizable losses in 1980 and 1981 from CMS transactions. The parties agree that if petitioner realized recognizable losses from the transactions, the amount of such losses is $194,573,659 for 1980 and $70,042,179 for 1981.

The parties' primary dispute centers on the proper interpretation of section 1.1001-1(a), Income Tax Regs. That section provides, in relevant part, that "Except as otherwise provided * * * the gain or loss realized from * * * the exchange of property for other property *differing materially* either in kind or in extent, is treated as income or as loss sustained." (Emphasis added.)

Respondent argues that the mortgages that petitioner received in the CMS transactions did not differ materially from the mortgages that it exchanged and that petitioner therefore sustained no losses from the exchanges. Petitioner

---

[20]This amount represents losses of $211,891,378 net of gains and related discount income of $553,435 from petitioner's 1981 resale/refinance transactions.

[21]This amount represents losses of $129,119,673 net of gains from petitioner's 1982 resale/refinance transactions and related discount income of $5,035,787 from both the 1981 and 1982 transactions.

argues that the mortgages it received in the CMS transactions did differ materially from the mortgages that it exchanged and that it therefore sustained recognizable losses from the exchanges.

The language in section 1.1001-1(a), Income Tax Regs., providing that gain or loss is realized from "the exchange of property for other property differing materially either in kind or in extent" derives from regulations issued in 1934. Those regulations provided that:

Except as otherwise provided, the Act regards as income or as loss sustained, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property *differing materially either in kind or in extent.* [Regs. 86, art. 111-1, Revenue Act of 1934; emphasis added.]

The language has been carried forward essentially unchanged to present section 1.1001-1(a).

In determining whether property received by a taxpayer in an exchange differs materially from the property exchanged so that the exchange results in realized losses and gains, courts compare the two properties to determine whether the taxpayer has acquired "a thing really different from what he theretofore had." *Girard Trust Co. v. United States,* 166 F.2d 773, 774 (3d Cir. 1948); *Emery v. Commissioner,* 8 T.C. 979, 981-983 (1947), affd. 166 F.2d 27 (2d Cir. 1948). Gain or loss is realized from exchanges unless the properties exchanged are so similar that they represent the same property rights. *Emery v. Commissioner,* 8 T.C. at 982.

Applying these legal principles to the facts of this case, it is apparent that petitioner realized losses from the CMS transactions. The mortgages that petitioner received did not represent the same property rights as the mortgages that petitioner exchanged. As we found *supra,* the mortgages that petitioner received were obligations of different parties than the mortgages that petitioner exchanged. Additionally, the mortgages that petitioner received were collateralized by different properties than the mortgages that petitioner exchanged. We consider both of these differences to be material differences. The fact that the mortgages that petitioner received have experienced different rates of foreclosure, prepayment, and delinquency since the CMS transac-

tions took place confirms that the mortgages petitioner received were "really different from what he theretofore had."

In concluding that the mortgages that petitioner received were materially different from the mortgages that petitioner exchanged, we have considered the many similarities in the mortgages. Although we agree with respondent that the mortgages exchanged were similar in many respects, we disagree with respondent's conclusion that the similarities compel us to hold that there were no material differences in the mortgages. We consider it significant that respondent failed to produce any evidence that the similarities between the mortgages exchanged made it likely that they would be substantially identical from an economic perspective. Petitioner's economic expert, John P. Danforth, testified that the individual loans themselves, as well as the aggregate pools exchanged, could behave materially differently from an economic perspective, and that it would be an "incredible coincidence" for them to perform in an identical fashion. We think that this reflects reality and commonsense.

The fact that the market values of the two pools of mortgages exchanged were the same, or almost the same, is not determinative. Current market value reflects an amalgam of the interest rate, the face amount, and the maturity of the obligation. It is not necessarily a clear reflection of the value of the underlying security, the creditworthiness of the borrower, or of varying local economic circumstances which may have future effect on these factors. The first mortgage bond of railroad A is not the same property in kind or quality as the first mortgage bond of food processing company B, even though the two bonds may carry the same face amount, the same rate of interest, the same maturity, and may happen, at the moment, to be quoted at the same price in the open market. We hold that the similarities here do not result in there being no material differences in the mortgages.

Respondent asks us to apply the "mass asset rule" to the pools of mortgages involved in the CMS transactions and to ignore the differences between the individual mortgages contained in the pools. It has been held that the rule does not apply where the individual assets making up the

"mass" can be and are separately valued, as here. *Commissioner v. Seaboard Finance Co.*, 367 F.2d 646 (9th Cir. 1966), affg. T.C. Memo. 1964-253; see *Boe v. Commissioner*, 307 F.2d 339, 343-344 (9th Cir. 1962), affg. 35 T.C. 720 (1961). Even if we were to accept respondent's argument that the rule, which is generally applied only when it is impractical to assign separate values or useful lives to individual assets contained in a group of assets (see, e.g., *Tomlinson v. Commissioner*, 58 T.C. 570, 581 (1972), affd. per curiam 507 F.2d 723 (9th Cir. 1974); *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912, 923 (1961), affd. 309 F.2d 279 (3d Cir. 1962)), applies in this case, the record simply does not support respondent's argument that the pools of mortgages exchanged in each of the CMS transactions did not differ materially. Danforth's testimony, as well as the actual economic performance of the pools exchanged, establishes that they were materially different.

Respondent next argues that section 1091[22] precludes the recognition of losses realized by petitioner from the CMS transactions.[23] Section 1091(a) disallows the deduction of losses from the sale or other disposition of stock or securities when the taxpayer acquires substantially identical property within 30 days of the sale or disposition. Although it is uncertain whether mortgages constitute "stock or securities" within the meaning of section 1091, we need not decide the issue. For the deduction of petitioner's losses to be disallowed under section 1091, we must conclude that the mortgages petitioner exchanged were substantially identical to the mortgages it received. We conclude instead that the two pools of mortgages were substantially different.

---

[22] All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

[23] Sec. 1091(a) provides:

SEC. 1091(a). DISALLOWANCE OF LOSS DEDUCTION.—In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange on which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 165(c)(2); nor shall such deduction be allowed a corporation under section 165(a) unless it is a dealer in stocks or securities, and the loss is sustained in a transaction made in the ordinary course of its business.

Our conclusion that the mortgages petitioner received are substantially different from the mortgages that it exchanged is supported by our decision in *Hanlin v. Commissioner*, 38 B.T.A. 811 (1938), affd. 108 F.2d 429 (3d Cir. 1939). In *Hanlin*, a taxpayer had exchanged bonds issued by one Federal Land Bank for bonds issued by another Federal Land Bank. The bonds were each collateralized by different mortgages. Although the bonds had the same par value and price, and bore the same rate of interest, we held that they were not substantially identical. *Hanlin v. Commissioner*, 38 B.T.A. at 819-820.

In affirming our decision, the Court of Appeals for the Third Circuit recognized that debt instruments can differ due to, inter alia, different obligors and different collateral. Although the court was unable to conclude that the issuers of the bonds were different as the issuers were secondarily liable on each other's bonds, the court did conclude that different collateral underlay the bonds exchanged. The fact that different collateral supported the bonds exchanged prevented them from being substantially identical. *Hanlin v. Commissioner*, 108 F.2d at 431.

In this case we have already found that different properties collateralized the mortgages exchanged. In addition, the mortgages were obligations of different borrowers. In these circumstances, we hold that section 1091 does not apply to disallow the recognition of the losses realized by petitioner from the CMS transactions.

Respondent's final argument for disallowing the deduction of losses from the CMS transactions is that the CMS transactions "lacked economic substance and reality." We disagree with respondent's argument.

It is well settled that taxpayers are free to minimize their taxes by any legitimate means. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 448 (D.C. Cir. 1972). We have recognized that the deduction of bona fide losses may not be disallowed simply because petitioner was motivated by a desire to reduce its taxes. *Joseph E. Widener, Trust No. 5 v. Commissioner*, 80 T.C. 304, 310 (1983).

The losses that petitioner realized from the CMS transactions were from bona fide exchanges between unrelated

parties. As we have found, petitioner had significant business reasons for engaging in the transactions. In these circumstances, we reject respondent's argument that petitioner's losses from the CMS transactions "lacked economic substance and reality" and are not deductible. On the record presented here, we hold that the exchanges in which petitioner participated under the CMS program resulted in closed and completed transactions within the meaning of section 165 and section 1.165-1(b), Income Tax Regs., and that petitioner is entitled, under the provisions of sections 1001 and 1011, to tax recognition of the resulting losses in the amounts which the parties have stipulated.

## II. *Resale/Refinance Transactions*

Petitioner argues that the step-transaction and substance-over-form doctrines apply to resale/refinance transactions and that they should be viewed as exchanges by petitioner of the original mortgage loans plus cash in return for the new mortgage loans. Respondent argues that regardless of whether the step-transaction doctrine applies, the substance of the transactions was consistent with their form and the original loans were repaid from the proceeds of the new loans, not exchanged for the new loans.

We disagree with petitioner's position on two major grounds. One, perhaps, is more procedural in nature; the second is substantive.

First. As we said in *Bolger v. Commissioner,* 59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." Taxpayers are entitled to attack the form of their transactions only when their tax reporting and other actions have shown an honest and consistent respect for what they argue is the substance of the transactions. *Comdisco, Inc. v. United States,* 756 F.2d 569, 578 (7th Cir. 1985); *Illinois Power Co. v. Commissioner,* 87 T.C. 1417, 1430 (1986). In this case, as our findings show, petitioner's tax reporting and other actions have not shown such an honest and consistent respect for what it now claims to be the substance of the resale/refinance transactions. Although petitioner now argues that the transactions were taxable exchanges, *it did not report them as such on either its*

original income tax returns or on its financial reports. As this Court stated in *Groetzinger v. Commissioner,* 87 T.C. 533, 542 (1986):

In applying the substance-over-form doctrine we are concerned with the intentions *at the time of the agreement* and economic realities *as then perceived by the participants.* * * * [Emphasis added.]

In this case, when the resale/refinance transactions took place, it is clear that petitioner did not perceive them to be taxable exchanges. We are accordingly disinclined to accept petitioner's attempt to recharacterize them by hindsight, and after it conceived that a tax advantage could be obtained.

Second. More importantly, we think that petitioner must fail here on the substance of the transactions which took place. As the facts in this case clearly show, the old mortgages in the resale/refinance transactions were paid off in full, and were replaced by petitioner's purchase of new mortgages, in different amounts, with different terms, and (in the case of resale transactions) with new obligors. When an old mortgage was paid off, the note was marked "paid" and the lien securing it was released. At that point it disappeared, and there was nothing left which petitioner could "exchange" with the savings and loan lender for the new mortgage which had been created, except the cash which petitioner paid to acquire such new mortgage. To try to create an "exchange" out of these transactions simply distorts the facts beyond recognition.[24]

We concede that there was an interrelationship between the two transactions. Petitioner sponsored the program, and encouraged the local savings and loan associations to participate in it, for the valid business reasons which we have found. The lending savings and loan institutions were assured that if they placed new loans in conformity with the criteria laid down by petitioner, then petitioner would purchase such loans once made. This fact, however, cannot obscure the substance of the transaction, which was that the old loan in petitioner's hands was completely paid off, and a new loan, with materially different terms and

---

[24]We agree with respondent, contrary to petitioner's urging, that his answer cannot reasonably be construed as an admission that the transactions were taxable exchanges.

frequently with a different obligor, was purchased. We think that here the form of the transaction, as petitioner originally treated it, corresponded to the substance, and that no exchange took place here, taxable or otherwise.

Having concluded that the resale/refinance transactions may not be viewed as taxable exchanges, we must next determine their proper tax treatment. Respondent determined that petitioner realized taxable gains to the extent that its bases in the old mortgages were less than the amounts repaid by the borrowers. We agree.

When a borrower obtains a loan from a lender and purports to use the proceeds of the loan to repay another loan from the same lender, there are two ways that the transaction can be viewed. The second loan can be viewed as merely a refinancing of the original loan, with the result that the original loan is not treated as having been repaid, or the second loan can be viewed as a separate loan, with the result that the original loan is treated as having been repaid. Whether the original loan is properly characterized as having been repaid is a factual question. *Buddy Schoellkopf Products, Inc. v. Commissioner,* 65 T.C. 640, 649 (1975). The crucial inquiry is whether the second loan is simply designed as a refinancing of the original loan, or whether the differences between the two loans are so great that the original loan can properly be characterized as having been repaid. *Buddy Schoellkopf Products, Inc. v. Commissioner, supra* at 649. In this case, as we have said, we have no difficulty in concluding that the original mortgages can properly be characterized as having been repaid.

In *Schoellkopf,* we held that an original loan could properly be characterized as having been repaid from the proceeds of a second loan from the same lender, the terms of which required a portion of the proceeds to be used to repay the original loan. In so holding, we relied on three differences between the second loan and the original loan. First, the second loan provided the borrower with new funds in addition to the funds used to pay the original loan, and was thus not simply a refinancing of the original loan. Second, the second loan had a different interest rate than the original loan. Third, the second loan had a different

maturity date from the original loan. In this case, each of these three differences are present[25] and, in addition, there are other material differences between the original and new mortgages. As we found *supra,* the original mortgages were assumable, either by their own terms or because of petitioner's commitment not to enforce due-on-sale clauses. The new mortgages were generally assumable only within 1 year of when they were made. In addition, most of the original mortgages were FHA and VA mortgages. The new mortgages were all conventional mortgages. Finally, in resale transactions, which constituted most of the transactions, the obligor on each new mortgage was different from the obligor on each original mortgage. These many differences convince us that the original mortgages are properly characterized as having been repaid.

In sum, we hold that petitioner realized taxable gains when the original loans were repaid in full, in the amount that the sums repaid by the borrowers exceeded petitioner's bases in the loans, computed as provided in section 1001.

To reflect the foregoing and the concessions of the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, PARKER, SHIELDS, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, WELLS, and WHALEN, *JJ.,* agree with this opinion.

NIMS, WHITAKER, COHEN, and WILLIAMS, *JJ.,* concur in the result only.

GERBER and RUWE, *JJ.,* did not participate in the consideration of this case.

---

[25]The interest rates charged on the new mortgages were not merely a combination of the rates that had been charged on the original mortgages and the prevailing rates for the additional cash. The lenders were free to bargain for a higher rate than would be required by a combination of those rates, and they had an incentive to do so.