LEADER FEDERAL SAVINGS AND LOAN ASSOCIATION OF MEMPHIS AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leader Federal Sav. & Loan Ass'n v. Commissioner
Docket Nos. 44110-86, 44490-86
United States Tax Court
T.C. Memo 1989-321; 1989 Tax Ct. Memo LEXIS 321; 57 T.C.M. (CCH) 846; T.C.M. (RIA) 89321; July 3, 1989
*321 P, a Tennessee savings and loan association, was a member and shareholder of the Cincinnati District Bank, one of 12 district banks established by the Federal Home Loan Bank Act of 1932. During 1980 and 1981, P entered into mortgage swaps involving both 90 percent participation interests and whole mortgage loans. P also received common stock dividends from the Cincinnati District Bank in 1978, 1979, 1980 and 1981. In 1981, the Federal Home Loan Bank Board approved and the Cincinnati District Bank granted P's request to redeem a portion of P's stock. In 1980 and 1981, P received premature withdrawal penalty income from its depositors. Held, P realized losses on its mortgage swaps of both 90 percent participation interests and whole mortgage loans; these losses are recognized for Federal income tax purposes and are deductible. FNMA v. Commissioner, 90 T.C. 405 (1988), and Cottage Savings Association v. Commissioner, 90 T.C. 372 (1988), followed. Held further, P did not have an election within the meaning of I.R.C. sec. 305(b)(1) to receive cash dividends in lieu of stock dividends because the Cincinnati District *322 Bank and the Federal Home Loan Bank Board retained statutory authority to deny member banks' redemption requests. The value of the common stock dividends is not taxable to P. Frontier Savings Association v. Commissioner, 87 T.C. 665 (1986), affd. 854 F.2d 1001 (7th Cir. 1988), followed. Held further, the premature withdrawal penalties received by P do not give rise to income from the discharge of indebtedness under I.R.C. secs. 108 and 1017. Colonial Savings Association v. Commissioner, 85 T.C. 855 (1985), affd. 854 F.2d 1001 (7th Cir. 1988), followed. Richard L. Bacon, William F. Cooney *325 and Peter J. Valeta, for the petitioner. Kendall C. Jones and Nancy B. Romano, for the respondent. NIMS
MEMORANDUM OPINION NIMS, Chief Judge: This matter is before the Court on petitioner's motion for partial summary judgment pursuant to Rule 121. (All Rule references are to the Tax Court Rules of Practice and Procedure, and unless otherwise noted, all section references are to sections of the Internal Revenue Code in effect for the years in issue.) Respondent has filed a notice of objection to petitioner's motion for partial summary judgment and a cross-motion for partial summary judgment. Partial summary judgment is appropriate when there is a showing that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b). The parties have satisfied the requirements of Rule 121. For purposes of petitioner's motion for partial summary judgment, all of respondent's factual allegations are deemed admitted. Likewise, for purposes of respondent's cross-motion for partial summary judgment, all of petitioner's *326 factual allegations are deemed admitted. Century Data Systems, Inc. v. Commissioner, 86 T.C. 157, 159 (1986). We draw all inferences from the deemed admitted facts in favor of the nonmoving party. We find no genuine issue as to any material fact. Accordingly, partial summary adjudication is appropriate in each instance under Rule 121. Petitioner's principal place of business was in Memphis, Tennessee, at the time its petitions were filed. In these consolidated cases, respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1967
$     5,785
1970
271,732
1977
1,415,921
1978
2,734,790
1979
1,838,081
1980
405,593
Petitioner's motion for partial summary judgment and respondent's cross-motion for partial summary judgment raise three distinct issues. The parties' cross-motions do not address a fourth issue, which will require a trial on the merits, concerning investment tax credits for certain computer software and terminal installment costs. Petitioner's motion for partial summary judgment raises the following two issues: (1) whether petitioner realized and may recognize losses from the *327 sale of whole mortgage loans and 90 percent participation interests in mortgage loans; and (2) whether certain comon stock distributions petitioner received constitute taxable income under section 305(b)(1). Respondent's cross-motion for partial summary judgment raises the third issue which is whether premature withdrawal penalties "paid" to petitioner by some of its depositors represent income from the discharge of indebtedness under section 108 or ordinary income under section 61. Mortgage Swaps
Petitioner has moved for partial summary judgment determining that it realized and may recognize losses in the taxable years 1980 and 1981, arising from sales of whole mortgage loans and 90 percent participation interests in mortgage loans (hereinafter sometimes referred to as mortgage swaps or transactions). Respondent disputes that petitioner realized losses from its mortgage swaps. Respondent's primary contention is that petitioner merely exchanged or swapped whole mortgage loan and 90 percent participation interest packages for similar packages that were materially or substantially equivalent, thereby preventing realization under section 1001. Alternatively, respondent contends *328 that even if the mortgage swaps triggered a realization event under section 1001, section 165 would preclude recognition of the claimed losses because the transactions lacked economic substance and served no purpose other than to secure tax losses. We have previously found these arguments to be without foundation in FNMA v. Commissioner, 90 T.C. 405 (1988), and Cottage Savings Association v. Commissioner, 90 T.C. 372 (1988); see also San Antonio Savings Association v. Commissioner, T.C. Memo. 1988-204. Similarly, we so find here. Respondent has acknowledged that the facts herein are no more favorable to his position than those found in Cottage Savings. As in Cottage Savings, all of the mortgage swaps in issue were made pursuant to Federal Home Loan Bank Board (FHLBB) Memorandum R-49, which provides that concurrently "sold" and "purchased" mortgage loans need not be reported as losses for financial statement purposes if 10 criteria of equivalency between the transferred and acquired mortgage loans are met, namely, that such mortgage *329 loans must: 1. involve single-family residential mortgages, 2. be of similar type (e.g., conventionals for conventionals), 3. have the same stated term of maturity (e.g., 30 years), 4. have identical stated interest rates, 5. have similar seasoning (i.e., remaining terms to maturity), 6. have aggregate principal amounts within the lesser of 2 1/2 percent or $ 100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash, 7. be sold without recourse, 8. have similar fair market values, 9. have similar loan-to-loan ratios at the time of the reciprocal sale, and 10. have all security properties for both sides of the transaction in the same state. On June 30, 1980, petitioner transferred to Home Federal Savings and Loan Association of Nashville, Tennessee (Home Federal), approximately 90 conventional first mortgage loans owned by petitioner. The remaining principal balances on these transferred loans aggregated $ 5,018,547.41. On the same date, Home Federal transferred by wire $ 4,065,525.26 in cash to petitioner. All of the transferred mortgage loans were secured by residential properties in the Memphis, *330 Tennessee, metropolitan area. Also on June 30, 1980, petitioner acquired from Home Federal approximately 125 conventional first mortgage loans owned by Home Federal. The remaining principal balances on these acquired loans aggregated $ 5,025,929.30. On the same date, petitioner transferred by wire $ 4,071,505.33 in cash to Home Federal. All of the acquired mortgage loans were secured by residential properties in the Nashville, Tennessee, metropolitan area. On September 19, 1980, petitioner entered into similar transactions with First Federal Savings and Loan Association of Nashville, Tennessee (First Federal). Petitioner transferred to First Federal approximately 882 conventional first mortgage loans owned by petitioner. The remaining principal balances on these transferred loans aggregated $ 42,351,009.87. First Federal then transferred by wire $ 31,462,940.70 in cash to petitioner. All of the transferred mortgage loans were secured by residential properties located in the Memphis, Tennessee, metropolitan area. Also on September 19, 1980, petitioner acquired from First Federal approximately 960 conventional first mortgage loans owned by First Federal. The remaining principal *331 balances on these loans aggregated $ 42,349,186.16. On the same date, petitioner transferred by wire $ 31,458,823.14 in cash to First Federal. All of the acquired mortgage loans were secured by residential properties in the Nashville, Tennessee, metropolitan area. In addition to the above-described whole mortgage swaps, petitioner entered into the following swaps of 90 percent participation interests. On December 29, 1980, petitioner transferred to Federal National Mortgage Association (FNMA) 90 percent participation interests in each of approximately 908 conventional first mortgage loans owned by petitioner. The remaining principal balances on these transferred loans aggregated $ 32,819,798.65, of which 90 percent was $ 29,537,818.73. On the same date, FNMA transferred by wire $ 20,472,774.99 in cash to petitioner. All of the transferred participation interests were secured by residential properties in the Memphis, Tennessee, metropolitan area. Also on December 29, 1980, petitioner acquired from FNMA 90 percent participation interests in each of approximately 853 conventional first mortgage loans owned by FNMA. The remaining principal balances on these acquired loans aggregated *332 $ 32,819,797.10, of which 90 percent was $ 29,537,817.33. On the same date, petitioner transferred by wire $ 20,472,774.59 in cash to FNMA. Four hundred and eighty-three of the acquired participation interests were secured by residential properties located within the State of Tennessee, but outside the Memphis metropolitan area, while the remaining 370 were secured by residential properties in the Memphis metropolitan area. On April 22, 1981, petitioner transferred to FNMA 90 percent participation interests in each of approximately 443 conventional first mortgage loans owned by petitioner. The remaining principal balances on these transferred loans aggregated $ 8,992,796.73, of which 90 percent was $ 8,093,517.00. On the same date, FNMA transferred by wire $ 5,102,537.12 in cash to petitioner. All of the transferred participation interests were secured by residential properties in the Memphis, Tennessee, metropolitan area. Also on April 22, 1981, petitioner acquired from FNMA 90 percent participation interests in each of approximately 317 conventional first mortgage loans owned by FNMA. The remaining principal balances on these acquired loans aggregated $ 8,992,795.92, of *333 which 90 percent was $ 8,093,516.27. On the same date, petitioner transferred by wire $ 5,102,531.63 in cash to FNMA. One hundred and sixty-nine of the acquired participation interests were secured by residential properties located within the State of Tennessee, but outside the Memphis metropolitan area, while the remaining 148 were secured by residential properties in the Memphis metropolitan area. In each of the above-described whole mortgage loan and 90 percent participation interest swaps, petitioner transferred, without recourse, complete legal and beneficial ownership in the whole mortgage loans and 90 percent participation interests which it transferred. Similarly, petitioner acquired complete legal and beneficial ownership in the whole mortgage loans and 90 percent participation interests which it had acquired. Additionally, none of the transferred or acquired whole mortgage loans or 90 percent participation interests had common mortgagors or were secured by common real properties. For Federal income tax purposes, petitioner computed its losses from these transactions by subtracting the aggregate remaining principal balance of the whole mortgage loans or 90 percent participation *334 interests which it had transferred from the corresponding cash amounts it had received. Employing this formulation, petitioner's swaps of whole mortgage loans and 90 percent participation interests generated the following losses: Transfer
Transferee
Remaining
Cash
Date
Institution
Aggregate Balance
Received
Loss
June 30, 1980
Home Federal
$  5,018,547.41
$  4,065,525.26
$    953,022.15
Sept. 19, 1980
First Federal
42,351,009.87
31,462,940.70
10,888,069.17
Dec. 29, 1980
FNMA
29,537,818.73
20,472,774.99
9,065,043.74
Apr. 22, 1981
FNMA
8,093,517.00
5,102,537.12
2,990,979.88
Petitioner claimed $ 21,118,231 and $ 2,983,307 as deductible losses under section 1001 for the taxable years 1980 and 1981, respectively. [1] Through the use of carrybacks, these losses also impacted upon petitioner's taxable years 1967, 1970, 1977, 1978 and 1979. *335 Respondent contends that petitioner did not realize losses from its mortgage swaps because its simultaneous sale and purchase of whole mortgage loan and 90 percent participation interest packages did not constitute "the exchange of property for other property differing materially either in kind or in extent." Section 1.1001-1(a), Income Tax Regs. Petitioner contends that, as a matter of law, the packages that it sold differed materially in kind or in extent from the packages that it purchased because both the obligor and the underlying security of each transferred loan or participation interest differed from those of each acquired loan or participation interest. Petitioner's argument is based upon our decisions in FNMA and Cottage Savings. These cases solely involved swaps of 90 percent participation interests. The instant case involves swaps of whole mortgage loans as well as 90 percent participation interests. We find the analysis presented in those cases to be equally applicable to each type of swap. The Court's analysis has consistently focused "on the difference in obligors and the difference in assets underlying the promises of the *336 different obligors" in determining whether exchanged loan packages differ materially either in kind or in extent. Cottage Savings Association v. Commissioner, supra at 395; see also FNMA v. Commissioner, supra at 425; Hanlin v. Commissioner, 38 B.T.A. 811, 819-820 (1938), affd. 108 F.2d 429 (3d Cir. 1939). In the instant case, each mortgagor or obligor and each underlying asset or residential real property differed. We therefore conclude that the whole mortgage loan and 90 percent participation packages that petitioner transferred differed materially from the packages that petitioner acquired. Respondent next contends that section 165 precludes petitioner from claiming its mortgage swap losses because the swaps lacked economic substance and served no bona fide business purpose. [2] Petitioner asserts that while its motive is relevant, it is not the sole criterion in determining whether its mortgage swap losses can be recognized, and it nonetheless realized economic losses which are recognizable under section 165(a). We agree with petitioner. *337 As noted earlier, respondent has acknowledged for purposes of this motion that the facts in the instant case are no more favorable to his position than those present in Cottage Savings. In Cottage Savings we found that the transfers in issue were solely tax-motivated. Cottage Savings Association v. Commissioner, supra at 388-389. We will likewise assume in this case that petitioner's sole motivation in entering into the mortgage swaps was to realize and recognize tax losses. Petitioner's motivation is not alone fatal to its claimed deductions, but it does necessitate a closer scrutiny of the record. Cottage Savings Association v. Commissioner, supra at 388-389 (citing Joseph E. Widener, Trust No. 5 v. Commissioner, 80 T.C. 304, 310 (1983)). Under this heightened level of scrutiny, we found in Cottage Savings that the transfers in issue were closed and completed, changed the flow of economic benefits and that the computation of losses was not separately disputed. Therefore, because of respondent's acknowledgement, we similarly assume that the transactions before us were closed and completed, changed the *338 flow of economic benefits from the whole mortgage loans and 90 percent participation interests, and that the computation of losses is not separately disputed. Under these acknowledged facts, we find a sufficient presence of economic substance to sustain petitioner's claimed loss deductions under section 165(a). See San Antonio Savings Association v. Commissioner, supra.
For the foregoing reasons, the Court concludes that there is no genuine issue as to any material fact and that a decision on this issue may be rendered as a matter of law. Petitioner's motion for partial summary judgment will be granted on this issue. Common Stock Distributions
Petitioner has further moved for partial summary judgment determining that certain common stock distributions it received are not includable in its gross income pursuant to section 305(a). The characterization of these distributions as dividends, within section 316(a), is not in issue. [3] Thus, for the sake of convenience, we will hereinafter refer to them as stock dividends. *339 Respondent contends that petitioner and other shareholder banks of the Cincinnati District Bank (Cincinnati Bank) possessed the power to elect to have the stock dividends paid in property, and therefore under sections 305(b)(1) and 301 the fair market value of the stock dividends is taxable to petitioner. Respondent further asserts that the question of whether petitioner possessed the power to elect to receive property in lieu of stock is a legitimate question of fact which would make partial summary judgment inappropriate. We disagree, and for reasons set forth below, we grant petitioner's motion for partial summary judgment on the stock dividend issue. Reading all of the factual inferences in a manner most favorable to respondent, the material facts are as follows: Petitioner has been a member and stockholder of the Cincinnati Bank since 1934. The Cincinnati Bank is one of 11 district banks (12 prior to 1946) established pursuant to the Federal Home Loan Bank Act of 1932, 47 Stat. 725, 12 U.S.C. sec. 1421 et seq. The Cincinnati Bank's territory includes the States of Ohio, Kentucky and Tennessee. The district banks were capitalized with stock subscriptions *340 from member institutions and the U.S. Treasury. District banks operate under the supervision of the FHLBB, an administrative agency in the Executive Branch of the Federal Government. The Federal Home Loan Bank system was designed primarily as a reserve credit facility for savings and loan associations and other home mortgage credit institutions. Member banks are required by Federal law to maintain certain capital stock ownership in their respective district banks. 12 U.S.C. sec. 1426 (1982). Member banks' stock ownership requirements are determined at the end of each calendar year, with reference to each member bank's net home mortgage loans outstanding and total borrowings from their respective district banks. Each member bank generally must maintain a capital stock ownership interest in its district bank in an amount which at least equals one percent of the total outstanding balance of its home mortgage loans and at least one-twentieth of its borrowings from its district bank as of December 31 of each year. Each share of district bank stock is valued by statute at $ 100 par value. 12 U.S.C. secs. 1426(b) and (c). Based upon *341 the above year-end computations, member banks that are required to purchase additional stock of their district bank must do so by January 31 of the following year at the stated par value of $ 100 per share. As of December 31, 1981, the principal amount of petitioner's outstanding loans to borrowers made it legally necessary for petitioner to increase its stock ownership in the Cincinnati Bank by 657 shares pursuant to 12 U.S.C. sec. 1426(c). Accordingly, in 1982, petitioner purchased 657 additional shares of Cincinnati Bank stock at $ 100 per share. On November 17, 1978, the board of directors of the Cincinnati Bank (the board) adopted a resolution authorizing payment of accrued dividends on capital stock for 1978 at the rate of 6.54 percent. The resolution further provided that the dividends would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On December 15, 1978, the FHLBB approved the Cincinnati Bank stock dividend for 1978. On December 22, 1978, the Cincinnati Bank notified all of its members that it intended to issue a stock dividend instead of a cash dividend *342 for 1978. Prior to December 22, 1978, the Cincinnati Bank had always paid dividends in cash. On December 29, 1978, the Cincinnati Bank issued the stock dividend. Petitioner received a stock dividend of 3,988 shares (par value $ 398,800) and $ 82 in cash for fractional shares. On November 16, 1979, the board adopted a resolution authorizing payment of accrued dividends on capital stock for 1979 at the rate of 8 percent. The resolution further provided that the dividend would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On December 4, 1979, the FHLBB approved the Cincinnati Bank stock dividend for 1979. On December 13, 1979, the Cincinnati Bank notified its members that it intended to issue a stock dividend instead of a cash dividend. On December 31, 1979, the Cincinnati Bank issued the stock dividend. Petitioner received a stock dividend of 5,679 shares (par value $ 567,900) and $ 4 in cash for fractional shares. On April 16, 1980, the board adopted a resolution authorizing payment of accrued dividends on capital stock for the period January 1 through June 30, 1980, at the rate of *343 10 percent. The resolution further provided that the dividend would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On May 7, 1980, the FHLBB approved the Cincinnati Bank stock dividend for the period January 1 through June 30, 1980. On May 12, 1980, the Cincinnati Bank notified all of its members that it intended to issue a stock dividend instead of a cash dividend for the period January 1 through June 30, 1980. On June 30, 1980, the Cincinnati Bank issued the stock dividend for the period January 1 through June 30, 1980. Petitioner received a stock dividend of 3,812 shares (par value $ 381,200) and $ 40 in cash for fractional shares. On August 21, 1980, the board adopted a resolution authorizing payment of accrued dividends on capital stock for the period July 1 through September 30, 1980, at the rate of 12 percent. The resolution further provided that the dividend would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On September 23, 1980, the FHLBB approved the Cincinnati Bank stock dividend *344 for the period July 1 through September 30, 1980. On September 23, 1980, the Cincinnati Bank notified its members that it intended to issue a stock dividend instead of a cash dividend for the period July 1 through September 30, 1980. On September 30, 1980, the Cincinnati Bank issued the stock dividend for the period July 1 through September 30, 1980. Petitioner received a stock dividend of 2,427 shares (par value $ 242,700) and $ 56 in cash for fractional shares. On December 8, 1980, the board adopted a resolution authorizing payment of accrued dividends on capital stock for the period October 1 through December 31, 1980, at the rate of 8.18 percent. The resolution further provided that the dividend would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On December 15, 1980, the FHLBB approved the Cincinnati Bank stock dividend for the period October 1 through December 31, 1980. On December 19, 1980, the Cincinnati Bank notified its members that it intended to issue a stock dividend instead of a cash dividend for the period October 1 through December 31, 1980. On December 31, 1980, the *345 Cincinnati Bank issued the stock dividend for the period October 1 through December 31, 1980. Petitioner received a stock dividend of 1,704 shares (par value $ 170,400) and $ 69 in cash for fractional shares. On June 18, 1981, the board adopted a resolution authorizing payment of accrued dividends on capital stock for the period January 1 through June 30, 1981, at the rate of 4.5 percent. The resolution further provided that the dividend would be paid in capital stock (on the basis of one share of stock for each $ 100 dividend entitlement) with fractional shares to be paid in cash. On June 22, 1981, the FHLBB approved the Cincinnati Bank stock dividend for the period January 1 through June 30, 1981. On June 23, 1981, the Cincinnati Bank notified its members that it intended to issue a stock dividend instead of a cash dividend for the period January 1 through June 30, 1981. On June 30, 1981, the Cincinnati Bank issued the stock dividend for the period January 1 through June 30, 1981. Petitioner received a stock dividend of 1,684 shares (par value $ 168,400) and $ 77 in cash for fractional shares. In summary, the Cincinnati Bank issued the following FHLBB approved stock dividends *346 to petitioner: Cash for
Date
Shares
Par Value
Fractional Shares
Dec. 29, 1978
3,988
$ 398,800
$ 82
Dec. 31, 1979
5,679
567,900
4
June 30, 1980
3,812
381,200
40
Sept. 30, 1980
2,427
242,700
56
Dec. 31, 1980
1,704
170,400
69
June 30, 1981
1,684
168,400
77
Member banks that own district bank stock in excess of the required number of shares may request that their district bank redeem their excess shares. District banks are authorized by statute to make such redemptions at their discretion. 12 U.S.C. sec. 1426(c)(1). The Cincinnati Bank granted and the FHLBB approved every member bank's redemption request from 1978 through 1982. As of December 31, 1980, petitioner had 9,111 shares more than its minimum stock ownership requirement in the Cincinnati Bank. Accordingly, it requested the Cincinnati Bank to repurchase those excess shares. On March 16, 1981, the Cincinnati Bank granted petitioner's request and redeemed 9,111 shares of stock. During each of the years 1978 through 1981, inclusive, at least one of the Cincinnati Bank's members received stock dividends *347 that were in excess of such member's statutory stockholding requirements and that such member requested redemption of the excess stock and, in fact, had the excess stock redeemed by the Cincinnati Bank. The value of common stock dividends declared by a corporation on its own shares is generally not taxable to its shareholders. Section 305(a). Where, however, dividends from a corporation are payable, at the election of its shareholders, in stock or property (such as cash), the receipt of dividends will be taxable to the shareholders under section 301. Section 305(b)(1). If a shareholder possesses such an elective power, the stock dividends will be taxable under sections 301 and 305(b)(1) regardless of whether the power is exercised. Section 1.305-2(a), Income Tax Regs.
Petitioner asserts that the value of the common stock dividends it received from the Cincinnati Bank is not taxable under section 305(a) and that it did not retain the power to elect to have the dividends paid in property. Respondent contends that petitioner and the other Cincinnati Bank shareholders *348 retained the power to elect to have dividends paid in property through their ability to request stock redemptions or cash payments for excess shares. Respondent further asserts that questions of fact remain which would prevent us from granting partial summary judgment on this issue. We agree with petitioner. The Court has previously addressed this issue in Frontier Savings Association v. Commissioner, 87 T.C. 665 (1986), affd. 854 F.2d 1001 (7th Cir. 1988); see also Western Federal Savings & Loan Association v. Commissioner, T.C. Memo. 1988-107. Respondent contends that these cases were wrongly decided. We do not agree. In Frontier Savings we held that stock dividends made by the Chicago District Bank (Chicago Bank) to its member banks were not includable in the member banks' income under section 305(b)(1). The Chicago Bank and the FHLBB were found to have granted every member bank's redemption request. The Court held that the power of the Chicago Bank's members to request redemptions which the Chicago Bank and the FHLBB could deny in their discretion, under 12 U.S.C. sec. 1426(c)(1), was in *349 harmony with section 305(a). Frontier Savings Association v. Commissioner, supra at 675-677. Respondent asserts in the case before us that because the Cincinnati Bank and the FHLBB granted every member bank's redemption request, the Cincinnati Bank's shareholders had a "de facto" power to elect to receive dividends in cash. We rejected this argument in Frontier Savings and do so here. The Cincinnati Bank and the FHLBB retained express statutory authority to deny redemption requests under 12 U.S.C. sec. 1426(c)(1). Their decision to refrain from exercising such authority by granting every redemption request does not create a "de facto" power in the member banks whereby they can elect to receive dividends in cash. Importantly, in this partial summary judgment proceeding, respondent does not allege that either the Cincinnati Bank or the FHLBB expressly agreed to forego their statutory authority to deny redemption requests by member banks. For the foregoing reasons, the Court concludes that there is no genuine issue as to any material fact and that a decision on this issue may be rendered as a matter of law. Petitioner's motion *350 for partial summary judgment will be granted on this issue. Premature Withdrawal Penalties
Respondent has moved for partial summary judgment determining that premature withdrawal penalties (hereinafter sometimes referred to as penalties) received by petitioner constitute ordinary income under section 61. Petitioner contends that the penalties in issue constitute discharge of indebtedness income under section 108. [4] We agree with respondent. During 1980 and 1981, petitioner offered its customers certificates of deposit and money market accounts (hereinafter sometimes referred to as time account(s)) with interest compounded monthly, quarterly, annually or on a term basis. If a customer withdrew a principal balance from such a time account prior to its maturity date, the customer was required to forfeit a specified amount as a premature withdrawal penalty *351 under both Federal regulations and the terms of petitioner's time accounts. Upon premature withdrawal, the customer would receive a net amount composed of the principal plus accrued interest to the date of withdrawal less the specified penalty for early withdrawal. No customers received their principal and accrued interest before having their penalty subtracted. Petitioner always reduced each customer's account balance by the specified penalty before remitting any funds to the customer. Petitioner received the following amounts of income from premature withdrawal penalties: Premature
Year
Withdrawal Penalties
1980
$ 2,043,447
1981
2,046,424
On its Federal income tax returns for the taxable years 1980 and 1981, petitioner reported the premature withdrawal penalties as discharge of indebtedness income under section 108, and it elected to reduce the basis of depreciable property by the excluded amounts under section 1017. [5] Respondent determined that the premature withdrawal penalties did not represent discharge of indebtedness income but were properly taxable as ordinary income under section 61(a), which generally provides that "gross income means all *352 income from whatever source derived." Respondent asserts that the facts of the case before us are virtually identical to those in Colonial Savings Association v. Commissioner, 85 T.C. 855 (1985), affd. 854 F.2d 1001 (7th Cir. 1988), and that the premature withdrawal penalties represent ordinary income under section 61, not income from the discharge of indebtedness under section 108. Petitioner asserts that our decision in Colonial Savings was wrongly decided and that the premature withdrawal penalties in issue represent income from the discharge of indebtedness under section 108. We agree with respondent and we will continue to follow our decision in Colonial Savings. For the foregoing *353 reasons, the Court concludes that there is no genuine issue as to any material fact and that a decision on this issue may be rendered as a matter of law. Respondent's motion for partial summary judgment will be granted. To reflect the foregoing, An appropriate order will be issued in docket No. 44110-86. An appropriate order will be issued in docket No. 44490-86 and decision will be entered under Rule 155. Footnotes
1. Section 1001(a) provides: (a) COMPUTATION OF GAIN OR LOSS. -- The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. Section 1001(c) provides: (c) RECOGNITION OF GAIN OR LOSS. -- Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.↩
2. Section 165(a) generally provides: There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.↩
3. Section 316(a) provides in part: (a) GENERAL RULE. -- For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩
4. Section 108(a) states: Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer * * *.↩
5. Section 1017(a) generally provides for the following treatment of amounts that are excludable from gross income under section 108(a): such portion [of the excludable amount] shall be applied in reduction of the basis of any property held by the taxpayer at the beginning of the taxable year following the taxable year in which the discharge occurs.↩